May it please the Court. Good morning, Your Honors. I am Robert King. I represent the minor league players. I'd like to reserve 10 minutes of my time since this involves a cross-appeal. This case presents an overarching question. Is Major League Baseball required to pay minor league baseball players minimum or defendants are obligated to pay them under wage and hour laws, plaintiffs need to prove two things, that they are employees and what they do playing minor league baseball is work. Now, the defendants might still be able to avoid that obligation if they can establish either of the exemptions that they've raised as affirmative defenses. But whether baseball is work, whether minor league players are employees, and whether either of these exemptions are effective, it's a matter for the court to decide. So, if the defense applies, those are common questions. They can be answered in one stroke with respect to all class members. There's been, there was no summary, there's not been a summary judgment ruling or anything? There has not been, Your Honor, correct. Only thing that, or motion to dismiss or anything like that? Uh, there was not. On the merits of any of these. Correct, correct. So, all that we're just looking at are the class action orders. Correct. This is just the class certification proceeding. Um, give me your summary list again of what, what are the easy, common issues that can be addressed without getting into the weeds. Whether they're employees. Whether they are employees. Whether, what they do, their team related activities is work. Whether either of the two exemptions apply, the creative professional exemption or the, um, seasonal amusement exemption. So. Those, and those can all be answered on the basis of common class-wide evidence. So, the district court was concerned about the choice of law analysis for the non, for employees, for players who are not employed in California. And so, it wouldn't certify the, um, the 23B3 classes except for the players who were working in California. Correct. Uh, correct. So, there's two questions I have, uh, for that. One is, why wasn't the district court correct that there was a significant choice of law issue for the non-California players? And, second, does it matter? Because, as you're saying, it doesn't matter because, and I think you, you had, um, a chart saying because all states, uh, define employees and work the same way. But, but start with the first question. Why wasn't there, why was the district court wrong in saying there was a significant choice of law issue for non-California players? Well, it, it wasn't so much non-California players. Well, I know, but I'm characterizing it as non-California players because California, it was clear. The Sullivan, that, that case applies, and California would put its, um, wage and hour laws, um, on people working in California. But, the district court said it's not, it doesn't apply to other players outside of California. So, outside of California, you have the states in which they're working. You have other states where their clubs may be incorporated. There, there's places where they may live. And, um, opposing counsel says all of those states may have an interest in imposing their wage and hour laws to protect their employees outside of California. So, that was the district court's concern. Yeah, and, and, and to clarify, what, what happened in California, what happens in California is, uh, in the California league, all of the work is done in California. All of the games are played in California. All of the travel is in California. All, all, all of the training is in California. That is also true with respect to the other two classes, the proposed classes. In Arizona, during the training seasons, all of the training, all of the games, all of the travel occurs exclusively in Arizona. But, district court says, so what? Arizona doesn't have a case like Sullivan. Well, and, and that, I think, is, gets to the heart of the district court's, uh, error. Uh, it, it wasn't, it's not, under the California governmental interest analysis, the question isn't, is there a case, uh, like Sullivan? The question is, what are the competing interests? Are there any competing interests? The first question is. But, but it's applied to California. So, the question is whether California has competing interests with these out-of-state players. That, that's how the district court characterized it. Well, the governmental interest analysis under Claxon would apply with deciding what law to be applied with respect to the Arizona class and the Florida class as well. So, how strong is California's interest in having Arizona apply to people working in Arizona? That, that's the confusion. That, that, that is, that, that is not how the governmental interest analysis works. Typically, if you're in California, the question is, the, the, the first, the first question is, are there any material differences? If there aren't any, then we're done. Well, we know Arizona doesn't have any overtime. Material differences with respect to the wage and hour laws or material difference with respect to how, whether the state thinks that their wage and hour laws should apply to their, to people working in the state? Material differences with respect to the law that governs the various issues in the case. And it is an issue by issue analysis as well. So, when the government, when, when, with respect to the Arizona class, for instance, under the second step of the governmental interest analysis, the court should have asked, identified, which states have a legitimate interest in having their law applied? Obviously, when you're talking about weeks and months of work in Arizona, Arizona has an interest just like California does in the settlement case. It has a pretty strong interest, doesn't it? Excuse me? It has a pretty strong interest, doesn't it? It has, I think, a near conclusive interest. How do you know that? Because they don't even have overtime. So, what, how about Massachusetts has a real strong interest in having its overtime law apply to its, to people employed by its companies, its residents in Arizona. Well. How do we know that Massachusetts' interest in having its overtime law apply isn't stronger, given that Arizona has no overtime? How could it be conclusive? Because there are competing interests that are involved. So, we've got Massachusetts' strong interest in overtime for, to protect its. I mean, within even a single state there are competing interests. Within Arizona, I mean, it's not merely the protection of employees whose interests are at stake. It's also the business environment, as the Sullivan case talks about, that a state may want to provide. A state may want to provide. Sullivan rejected that argument, right? They said, we don't care what Arizona and Colorado think about having a business-friendly state, because California, we're more important. But California, the Sullivan case did say that that business-friendly interest of Colorado applies within Colorado's borders. Let me get back to Massachusetts' interest in having its overtime law protect its residents. Right. Arizona doesn't have overtime, so it has no interest in overtime. So, why wouldn't a choice of law analysis say Massachusetts has a stronger interest? Because that's what I was just addressing. The interest that Arizona has in providing a friendly business environment in its state is reflected by the fact that it doesn't have an overtime law. So, that is an interest in what goes on in its state. It wants to attract business. But that's something that the court would have to evaluate and determine who has the stronger interest. That's the final step of the governmental interest analysis, whose interests would be more impaired. And the other problem with the exportation of an overtime law, for instance, in the example that you give, is there is a presumption, as we've addressed in the briefs, against the extraterritorial application of the law. So, there is in California. Is there in other states? So, California's state law has that presumption, unless there's some strong indication of interest. Does Arizona have that presumption? I think that's a general universal proposition of law. Okay, so you don't know. We cited the case law that's available on it, and it's true outside of California. The United States Supreme Court has talked about the fact that. But for federal laws. But typically state law as well. And I think as a proper, even if there is not a case in a particular jurisdiction, it is a typical presumption that a state's law applies within its own borders. But the other side cites a handful of cases, I have a list of them, where the state courts decided that, in fact, their laws should be applied extraterritorially because they had a very strong interest in protecting their employees and making sure that they were covered. So, in this area, I guess I'm sympathetic to the district court's concern that there's a lot of different state laws it would have to look at. Yeah, I think if you also look at the amici, the brief by the law professors who are the authors of the leading treatise on conflicts of law, this is a generally not disputed proposition of law, that wage and hour laws operate, generally speaking, except for a few fringe exceptions, within the state whose state we're talking about where the work was performed. And it makes common sense. I mean, one of the interests that every single state has in applying its wage laws within its own borders is the certainty. Can you imagine, I can't imagine outside the context of this litigation that these employers or any employers would be advocating, well, we don't know which wage and hour laws apply because we have workers who are from out of state. The certainty of who is paid and under what law, when they're paid, how they're paid, how much they're paid, that needs to be black and white. And it can't be black and white if the district... But that was argued in Sullivan the other way, right? In Sullivan, the argument was, I'm an employer in Massachusetts, and if I have workers working for a month in California, I don't want to have to, and I have other workers working in Arizona and other workers in Colorado, I just want to apply Massachusetts law across the board. It's much too difficult to have to evaluate every state's workers' wage and hour laws and apply them to my own employees. But that is one... California rejected that argument. Right. I think you can play it both ways, right? I don't think so. I think, as the amici point out, you know, the general proposition here is the old ancient maxim, when in Rome, do as the Romans. And that is what provides certainty. If you're going to have employees, you know, there can be exceptions. If you have a service person, for instance, who your company operates on where I'm from, St. Louis is on the border of Illinois, you know, a service person may cross state lines during the course of the day. There are fringe exceptions. But like Sullivan, when you're talking about days, weeks, and months of work within a state, I think most employers would expect to have to compensate their employees under the law of the state where that work is being performed. It's not unlike tax law. You earn wages in a state, you pay taxes. It's no different than that. So that is where I think that the district court went wrong. And in a couple of respects on this issue, as the defendants are continuing to argue right now, there might be states with a different interest. Even though they advocate for the application of law of another state in Arizona and Florida, there has been no identification of a definitive state interest in applying law territorially. It's been purely speculative and hypothetical. And, in fact, Judge Spiro said that about the defendants' arguments, which are the same arguments that he made with respect to the denial of the Arizona and Florida classes. He said that. But that's purely speculation. And that's all that we have so far. And I think we've demonstrated that Arizona and Florida both have a very strong, and I would submit, nearly conclusive interest in applying Arizona and Florida law in those states. Roberts. Roberts. Now, I feel like you're going down your time. You want to save some time for rebuttal. But we have a few other questions for you on other issues. So you had a — the district court also denied class certification under B-2 for the Arizona and Florida classes. Correct. Where did the district court go wrong? Where did the district court go wrong? Well, in that respect, I mean — And what is it, the relief, you're really seeking under B-2? Under B-2, the declaratory relief that is contrary to the position that defendants have always taken, that minor leaguers are not — are, in fact, employees. What they do is work an injunction compelling them to keep time records, which they don't do, an injunction compelling them to comply with Arizona and Florida wage law for the work that is performed in Florida and Arizona. Does the choice of law issue drive that issue as well? I mean, the district court seemed to think so. Well, the difficulty is in the very first step of the analysis when you look at the issues, the core central issues in this case. What is work? Who are employees? Do the exemptions apply? There really are no — there's no welter of varying state standards. I mean, on the definitions of work and employee, there is no conflict. How about on overtime? Is overtime a liability issue or is it a damages issue? So Arizona doesn't recognize overtime. Is that significant, a difference? There's no — we don't make a claim for overtime for the Arizona class for that reason. It is a liability issue in California where we have made a claim for overtime. It's also easy to demonstrate because the defendants have admitted, they stipulated, that they don't pay overtime. It is a policy of Major League Baseball not to pay overtime. So if the district court thought that there were competed — states might have competing interests for out-of-California players, the issue of overtime would go to liability, the defendant's liability. Do you agree with that? Could you — So Massachusetts says we pay overtime. All right. Arizona doesn't. We're evaluating — the court has to evaluate who — which laws apply. And the question — one argument could be, well, it doesn't matter because any differences between the two states' rules go to damages only. But overtime seems to be an element of liability, so that difference between Massachusetts and Arizona would go to liability as well, not just damages. Except that we are not making an overtime claim for the Arizona class. So that issue just simply wouldn't come up. Say, hypothetically, I didn't look at whether Massachusetts has stronger worker protection laws than Florida, but maybe allows more for overtime or allows overtime for times that are not protected in Florida. Would that be liability or damages? Again, it's not a claim that we're making on behalf of the Florida class because Florida law does not — So any employees and any players in Arizona who might have an overtime claim, you're not pursuing that on their behalf. They would just be out of luck. That's correct because we don't believe that under applicable choice of law rules, they have a claim for that for work that they performed in Arizona or Florida. Thank you. All right. I'll reserve the balance, Mike. Good morning. May it please the Court. My name is Elise Bloom, and I represent the appellees, cross-appellants in this case. Your Honors, I think that my adversary has skipped over an essential problem and impediment in this situation to class certification and the reason why the district court's order certifying the Rule 23 California League class should be reversed and why the FLSA collective similarly should be decertified. While my adversary argues that there are common questions as to whether the minor league players are employees and as to whether what they do is work, what he ignores is the fundamental issue in this case, which is the issue that the minor league players are seeking payment for minimum wage and overtime. And as Judge Spiro pointed out in one of his earlier decisions, in order to determine whether or not there's liability for minimum wage and overtime, you need to know at least two things. One thing you need to know is the number of hours that were spent on compensable work. The other thing you need to know is the compensation that was provided for those hours. I thought it was undisputed that they worked some time and were paid nothing. It is not undisputed that they worked some time and were paid nothing. In fact — If what they were doing in training is work. If they spent time training. So if that is work, they spent some time training and were paid nothing. I mean, that seems to be undisputed. No, not exactly, Your Honor. These are the classes that are at play. There's the California League class, and the California League class exists during the championship season. And the record is clear that during the championship season, they are provided with, at a minimum, a monthly salary. And the question with regard to the California class then becomes, is there a way to demonstrate compensable hours on a group-wide basis? Because otherwise, there's no way to know whether or not they've been paid minimum wage and whether or not they've been paid overtime. I think what you're referring to were the allegations about spring training. And spring training is part of the Fair Labor Standards Act collective that was certified by the judge. And the record shows that during the time that players spent in spring training, they receive room, they receive board, and, in fact, some of them are actually paid. So, again, you're faced with the same problem. How many hours did they spend on compensable work? And what did they receive in compensation for those hours? And the problem in this case and the reason why the plaintiffs' California League class and FLSA collective should be decertified is because the plaintiffs have not provided a basis for demonstrating compensable hours. Didn't they invoke the continuous workday doctrine and the experts' reports that the district court relied upon? Yes, Your Honor. Exactly. It would allow them to meet that. I mean, it may not, the jury may not buy it, but they did present a basis or an approach on which they could prove that aspect of their case. Well, there's a fundamental problem with how they've tried to solve the problem, which is also reflected in the record. Yes, they have invoked the continuous workday rule. Somebody did. I don't know if they did or the district court did. I think the plaintiffs ultimately, I mean, this is, I'm sure the Court's familiar with the procedural history of this case. This is the plaintiffs' second attempt at getting a class or classes certified. And so in the course of these proceedings, yes, the plaintiffs said they were relying on the continuous workday doctrine. The continuous workday doctrine has two important requirements. You need to know when does the first whistle blow, when does the first compensable activity begin. And then you need to know when does the last whistle blow, when does the last compensable activity end. So what the plaintiffs said is, well, we can demonstrate that because we have a survey that our expert has done. The problem with the survey — And the district court said that was okay, basically. Well, the district — originally, originally in the first certification procedures, the district court said the survey was not okay. It was a pilot. I refer to them as a pilot. A pilot survey. And then the main study. Right. And one of the — I think the biggest problem — well, I don't want to call it the biggest problem, but a significant problem with Judge Spiro's certification order granting certification of the California League and the FLSA Collective is that he did rely on the survey. And actually, in his 1292B order certifying the question to this Court about the FLSA Collective, he said that if the survey — if the survey fails, there is no class. And the problem with the survey is that what it measured was the time that a player most often arrived at the ballpark and a time that a player most often left the ballpark. It did not in any shape or form measure compensable activities. And in the record, it is crystal clear, based on the testimony of the named plaintiffs themselves, that players come to the ballpark for all kinds of reasons that have other evidence besides the survey, correct? For California, they had the schedules and what not. The game series. Actually, Your Honor, they say that they have that. But if the Court takes a close look at the record, this is what you will find. The first thing that you will find is that there is not a schedule in the record from the California League. The second thing that you will find is that if you look at the survey itself, there is no way to tell whether any of the respondents in the survey were actually people that participated in the California League. The most that you know, the most you can tell, is what major league team did that player play for. But each major league team has six or eight affiliates. And of the teams that participate in the California League, their affiliates are spread. They're not just in California. They're all over the place. So the data in the survey tells you absolutely nothing about what happened with players in the California League. And this other evidence, the schedules that were submitted to the Court, again, they don't come from the California League. So the Court's really stuck with nothing. There's no way to quantify compensable time. And that problem is further exacerbated if you look at the expert reports that were provided. What are the amounts they're seeking for the California class? I'm not sure I understand. The damages, I guess. I couldn't answer that question. For the California class. They have not quantified that. Well, not so much the amount, but what period of time. Are they only seeking overtime? They're seeking minimum wage. Minimum wage. And overtime. For the California class. That's correct. That's correct. And so for the FISLA class in California, it's for the period of time when they're in spring training? No. There's the California League class that applies for players that participated in the California League. And then with regard to the FLSA collective, that is comprised of players that participated in spring training, may have participated in extended spring training, or the instructional leagues. In California? No. Okay, those are just in Arizona and Florida. Right, exactly. And also it wraps in any players that would have participated or did participate in the California League. But the problem with the California League, minimum wage and overtime. That's exactly right. For work, quote, done in California. Right, exactly right. Exactly right. In the championship season. During the championship season. That strikes me as kind of odd. It seems like there would be schedules for the championship season. So there should be schedules. Right. There aren't schedules in the record. But there's a couple of other really important points about the schedules. The evidence in the record is that schedules, to the extent they exist, are aspirational, meaning on any given day, any given thing can happen that can change what goes on on that day. A player could get injured. It could rain. So the schedules don't tell you exactly what happened on any particular day. And interestingly enough, again, going back to the schedules that are in the record, the ones that are not part of the California League, and the data in the survey itself, well, our expert, and it's in the supplemental record, the supplemental excerpts of records, looked at the data and looked at the schedules that had been provided from outside the California League. And you know what she found, interestingly enough, that the schedules that were provided for teams that the schedules are in the record, the start times and the supposed end times, don't correlate to the survey respondents who claim to have played for those teams. And what do I mean by that? I mean that the survey respondents who may have said that they arrived at the ballpark at the earliest time and left the ballpark at the latest time, those were not players that played for teams whose schedules would have also reflected earlier arrival time, earlier departure time. In fact, it was just the opposite. So there's no way even, based on the evidence in the record, to take the survey respondents, compare them to the schedules, and come up with some reasonable basis for determining how it worked. I just want to make sure I understand one thing, and maybe I haven't studied the record hard enough yet, but did the district court say that the main survey was admissible? Or did he say that it's reliable? Or did he make any determination on the reliability of the survey? Or has he reserved that for trial? He just said this is a method by which you can prove your case, and it looks fine for purposes of class certification. He denied our Daubert motion as to the main survey. But where we believe the error of law exists and where Judge Spiro signaled that he may not have applied the proper standard in evaluating the survey in his 1292B order is that the survey — the question is whether or not the survey allows the plaintiffs to meet the requirements of Rule 23. Whether the survey is admissible or not, the weight to which a jury might ultimately apply to the survey is not the question here. The question here is, did the survey give the plaintiffs a vehicle for meeting the requirements of Rule 23? And he said yes. He said yes initially, and then in his Rule — and then in his 1292B order, he wasn't — he wasn't too sure. And he did make the point that if the survey fails, if the survey doesn't work to demonstrate what's necessary for a continuous workday, then I wouldn't have certified the California League class. And that's a really important point, because the problem here in — is not, is the survey reliable? The question is, does the survey provide the basis for demonstrating hours worked on a group basis? And he did. Do we review that for abuse of discretion? Yes. Or for clear air? It's reviewed for abuse of discretion. But a piece of that is whether or not he did commit an error of law. And the error of law that — one among the errors of law that we believe he committed is that the survey does not meet — does not allow the plaintiffs to meet the requirements of Rule 23, because it doesn't provide the basis for determining hours worked on a group basis. Okay. So you had an appeal from the — from the district court's California class certification in — That's correct. — in FISLA. Did you want to say more about FISLA? Because I think you should address their — their appeal on the Arizona and Florida classes as well. Yes, of course. And we're starting to run out of time. I'll give you a little extra time, but I want you to — So with regard — we believe that the district court correctly denied certification as to the Florida and Arizona classes. You know, one basis upon which we believe the district court was correct was what we've just been talking about, the inability to quantify hours worked on a group basis. But the other issue is this issue that goes to conflicts of laws. And I think the first — the fundamental fact that ties into class certification here is not a question of whether ultimately Massachusetts law will apply, New York law will apply, Arizona law will apply, Florida law will apply. The question is, will the court have to do a conflicts of law analysis? And will that analysis be different depending on who the player is? And there's no way to answer those questions other than by saying yes, because the players come from 48 different states. And among those states are states like Massachusetts, states like New York, states like Oregon, who have — states like Washington, who have things like overtime. They have things like longer statute of limitations. And you have players who are in Florida or Arizona for a short period of time in the entire baseball year. Because remember, the name plaintiffs in this case, they're seeking compensation for 365 days a year of baseball-related activities. So you have to measure the time spent in spring training versus the entire possible universe. And the question isn't ultimately whether Massachusetts law applies or Arizona law applies. The question is, will the court need to do the conflict of laws analysis? So why isn't it the simple answer that appellants argue, that the law of the state where the employee is working applies? Because that's not the law. Start with that. And the problem for class certification is that you have to do the conflicts of public analysis, and that's what destroys the predominance. And the other piece of that is, that's nice for them to say that, but I bet you, and we've cited the Court a number of cases, for example, in Massachusetts, where Massachusetts protects its residents and inhabitants that may perform some work outside of the State. And I bet you that, like, their name plaintiff, Ryan Corey, Corey, who played for the Red Sox, signed his UPC in Massachusetts, spent time during the championship season in Massachusetts, spent no time in Florida except during spring training, I bet you that plaintiff is going to argue for application of Massachusetts law. He's not going to want to forfeit his overtime, and I think I might disagree with them on what Florida law says about overtime, but you better bet that he's going to argue for application of Massachusetts law. But only as to the championship season? No, this is as to spring training. I understand that, but as you say, that's de minimis. So what's the big deal? So he doesn't get overtime during spring training? Well, the question, well, I don't agree. I agree that it is de minimis in terms of the time spent within Florida versus the time spent within Massachusetts.  But Florida will still need to do that conflicts-of-law analysis to determine whether or not Mr. Corey, for example, is entitled to minimum wage and whether he's entitled to overtime, and how many years is he entitled to that for? Does he get the benefit, like a plaintiff, for example, from New York? Does that person get the benefit of the six-year statute of limitations? Let me ask you this. So when you do a conflict-of-laws analysis, you apply the law of the form, correct? The conflicts-of-laws form, that's correct. Right. So the district court here was looking to Sullivan. Correct. Right? And the analysis with respect to California is pretty straightforward. I don't completely agree with that. I think Sullivan leaves it. I'll take that. Sullivan leaves a big hole. I mean- But you'd have a tough argument to say that California- Well, it- But I don't want to go there right now. Okay. I want to focus on Arizona and Florida. Okay, so the district court is trying to decide what law- the plaintiffs have identified, they've narrowed their class, and they said, we only want to file-we only want to pursue a subclass of Arizona plaintiffs who have worked in Arizona and are entitled to minimum wage in Arizona. Right? That's their class. And the same-a similar class for Florida plaintiffs. That's what they- Okay. That's their argument. All right. So that's their-but that's the class they proposed to the district court. That's the class-what they proposed to the district court was an Arizona class and a Florida class. Yes. Where we got into the conflicts of laws issue is that in order for that class to meet the requirements of Rule 23, you've got to show that you're not going to have a predominance- Well, wait a minute. Wait a minute, though. But-so the district court says, okay, what law is going to apply to that Arizona class and Florida class? All right? They might like to say, well, California law should apply because it's so great. Right? No, no, no, no, no, no, no, not California law. So what law are we going to apply? And so the court then goes through the governmental interest analysis. Right. And as Judge Okuda says, there's probably a conflict between, you know, California law and Arizona law. Right. And you get down to the bottom of the analysis, the third step, and then you ask, well, which one- Right. The third step. And they come back and they say, well, you know, every state should apply, you know, would want to apply its law to work performed within its state. But they're wrong. And that's-the district court's-and the district court at the end of the analysis says, yep, we're going to apply-we're going to apply your claim for minimum wage. We're going to apply Arizona law. Why doesn't that make sense? Because that's not what the governmental analysis tests-well, the first problem is that before you could even get there, you're going to have to do the analysis of, are there other state laws that might have an interest? Right. Do those-are those state laws different than the law of Arizona? And at the end of the day, which state has the greater interest? And in Solomon, the piece that always gets lost in that case is that the court actually did do that analysis at the end of the day. So the fact that you're going to have to do the analysis and that the analysis is going to be different for each of the players, because the players don't all come from California to Arizona. But wouldn't that-wouldn't that depend on, let's say, you know, if a player was asking for overtime, if the class sought overtime, then I think, you know, you might have a really good point. But they're not seeking overtime. They're seeking minimum wage. I don't think that's the end of the inquiry. And, for example, let's use one of their named plaintiffs, Joel Weeks. Joel Weeks played for the Giants, right here. Played for the San Francisco Giants. He's scouted in California. He signs his UPC in California. He spends every single day of the off-season in California. He goes for four weeks to Arizona. What rate of minimum wage is he entitled to? If I'm Joel Weeks, I'm going to argue that I'm entitled to the minimum wage rate in California as opposed to the minimum wage in Arizona. Let me ask you this. Why wouldn't that-would Mr. Weeks have an opportunity to opt out of the class? Well, he has the name plaintiff, so I assume- Well, I mean, let's say that some class member. Notice gets sent to the class member, this is what we're seeking. You have the right to opt out if you want overtime, if you want this and you want that. Opt out. File your own lawsuit. So, yes. In the purest sense, Mr. Weeks or whomever would have the right to opt out. But the question is, will the court be required to do an individualized analysis for each of these players under the conflicts of laws principles that apply here in California? And the answer is yes. The court will be required to do that. And the fact that the court is required to do that destroys predominance. And Judge Spiro was correct when he recognized that that was a basis for not certifying the Arizona and Florida classes. So we ask that this court reverse the certification of the California class for the reasons we've discussed as well as the reasons set forth in our brief and decertify the FLSA collective and affirm Judge Spiro's order denying the Arizona and Florida classes from being certified. Thank you. Thank you. It is true that for the claim of damages for the B3 classes that the plaintiffs will ultimately have to demonstrate the number of hours worked on average under Tyson Foods. And with respect to the California class, the amount of compensation that players receive during the championship season will certainly have to be taken into account in the analysis. And Judge Spiro understood that. With respect to the training season classes, maybe I misunderstood counsel, but as Judge Spiro said at page 55 of his order, which is ER 159, virtually all players were unpaid for their participation in spring training, extended spring training, and instructional leagues. They weren't paid there. And as he recognized, if we can demonstrate that they were there and did any work, we've demonstrated a violation of the minimum wage laws in those two states for those two classes. And with respect to whether or not we have changed our theory on appeal and now rely solely on the survey, that's simply not true. At page 23 of our reply brief, docket 53, we have a graphic that demonstrates, it actually demonstrates, and I don't think we explained it quite like this, but it demonstrates what we can prove without the survey and what we can prove with the survey. Without the survey, we have the bulk of the day. It's based on schedules, game times, travel times. Are you talking about the California leagues? For all the classes. For all the classes? For all the classes, we can do this. By the way, one of the things that Judge Spiro noted was that on the new motion for class certification, you inserted the continuous workday doctrine for FSLA. Right. We actually had raised that. And you applied it to California. Right. Correct? And to the training classes, Arizona and Florida. Does California recognize the continuous workday doctrine? Yes. Every jurisdiction does. From FSLA? Pardon me? From FSLA? They have their own? Do they have their own continuous workday doctrine? Oh, no. I mean, this is where you find states just typically follow federal law on these issues. So if I were to look in California law, I would find that they've adopted the? Yeah. I believe there's a Ninth Circuit case on it, and the name escapes me right now, applying the continuous workday doctrine to a case brought under California law. Are there any states that are less protective, or are there states that are more protective? There's not a single case that has said they don't follow federal law on this issue. Okay. All right. And with respect to schedules, by the way, what we have in the record demonstrates that we were relying on schedules. We have hundreds, if not thousands, of schedules in the record, and those are only exemplars. That's a sampling of what we have. There have been more schedules produced since we put those in the record, and you can find, and I can provide the court the PACER site to the district court stock, and this is Exhibit R37. This is a California schedule. So the fact that it didn't make it into the excerpts of the record on appeal doesn't mean it's not there, and to the extent that it's not there in the district court, we have a lot more than what we put in. So we do have California schedules. There are eight California affiliates in the California league right now. Five of them are California major league teams. The other three are not. With respect to the issue of whether or not the schedules are reflective of what happened across the board and reflective of what the players said in response to the survey, we have provided the court a chart. It can be found at FER page 1 through 8, summarizing the testimony of 38 players about the routine nature of the work. Quotes like, except for the difference in the names of the coaches and the color of the paint on the wall, you know, the routines were the same. Whether or not they happened at exactly the same time on the clock every day or for every team, the amount of time spent was roughly the same. I see that my time has expired. How do you respond to counsel's argument that, so in Arizona and Florida, there's no claim, as I understand it, for overtime, right? Pardon me? In Arizona and Florida, there's not a claim for overtime. Correct. Okay. She just pointed out, though, that with respect to minimum wage, a player, say, from the generous state of Washington is entitled to $15 an hour. But in Arizona, $7. What is that player to do? With respect to the work that he does in another state for days and weeks and months at a time, he's stuck with the law of the state where he performed the work. I mean, I, as a plaintiff's lawyer, would love to make the argument that my opposing counsel has suggested, but it's simply not the law. It is not a – and it's not the interest of the plaintiffs that counts in a governmental interest analysis. And, by the way, as the amici point out, the test that most other states follow, the restatement, the no significant relationship test, is not very dissimilar. They're very similar tests. And the question is, what is the state's interest? What are the competing state interests? And which state's interest would be more impaired if its law were not applied? And in California, just as a – But you're saying we can tell that as a matter of law based on the amici's principle. I mean, that's – that's what you're saying. Well, we've cited – yeah, we've cited legions of cases from many jurisdictions around the country that demonstrate that the critical factor in the run-on-the-mill case, like this case, is where was the work performed. And that's because the interest of the state in ensuring, as a predictive matter, not as, you know, trying to divide equities in a case like a car accident case that happens out of state, you know, some sort of choice of alliance, but in terms of predicting and regulating conduct, the certainty – every state has an interest in the certainty that an employer knows when the work is being performed in that state. Other than fleeting forays across state lines, you've got to apply the law of the state where the work was performed. Okay. Thank you very much. Thank you, counsel, from both sides. Thank you, Your Honor. And safe travels to everybody. And we appreciate your arguments. It's an interesting case. All rise.
judges: Murphy, Paez, Ikuta